UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JESSIE NOBLES** | * | **DOCKET NO.** _____ |
| | * | |
| **V.** | * | |
| | * | |
| **TOWN OF KILLIAN,** | * | **JUDGE:** _____ |
| **KILLIAN POLICE DEPARTMENT,** | * | |
| **CHIEF DENNIS HILL, AND** | * | |
| **OFFICER SHANNON WRIGHT MACK** | * | |
| | * | **MAGISTRATE:** _____ |
| * * * * * * * * * * * * * * * * * * | | |

## COMPLAINT

1.    This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and under the laws of the State of Louisiana, against the Town of Killian, Killian Police Department, Chief of Police Dennis Hill, and Officer Shannon Wright Mack, Individually and in Their Official Capacities as Police Officers with the Town of Killian.

2.    Upon information and belief, Defendant Officer Shannon Wright Mack once employed Plaintiff Jessie Nobles in a private enterprise which Officer Mack had established for the purpose of performing debris cleanup in Livingston Parish following Hurricanes Katrina and Rita.

3.    Upon information and belief, Defendant Mack could not actively petition the Livingston Parish Council to be awarded the referenced cleanup contract on his own behalf; ergo, Defendant Mack "rented out" all of the equipment owned by his company, White Horse Maintenance, Inc., to his father, and Defendant Mack did thereafter successfully petition the Council to have cleanup work awarded to a company purported to be owned by his father.

4.    Plaintiff Jessie Nobles was a former employee of White Horse Maintenance, Inc.

- 1 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 1 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 1 of 68

ALL-STATE LEGAL®
EXHIBIT
A

(and its subsequent permutations) who was not paid upon completion of a debris removal project.

5. At a point well prior to the events made subject of this suit, Plaintiff Nobles confronted Defendant Mack regarding his unpaid wages, and Defendant Mack threatened all manner of harm against Plaintiff.

6. Upon information and belief, Defendant Mack used his own January 29, 2010, hiring by the Killian Police Department to carry out his own petty personal vendetta against the Plaintiff.

7. To this end, Defendant Mack effected a full custodial arrest of Plaintiff Nobles on a Saturday morning during a holiday weekend, physically assaulted and injured the Plaintiff, and transported Plaintiff to the police station—all on charges of unpaid traffic tickets.

8. After exacting his "revenge" arrest, Defendant Mack released Plaintiff Nobles to his family members, and several months later all charges against Plaintiff Nobles were unconditionally dismissed by Defendant Chief Dennis Hill.

9. Plaintiff sustained an inordinate amount of personal embarrassment and humiliation where his arrest took place in the company of family and friends gathered for a Memorial Day barbeque.

10. Plaintiff also sustained serious personal injuries attendant to his false arrest and imprisonment, where Defendant Mack slammed Plaintiff's body into the side of Defendant's police car, and he caused Plaintiff to strike his head while being pushed into the car's back seat.

## JURISDICTION

11. The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Ten (10), in their entirety, as if fully copied *in extenso* herein.

**12.** Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, and 1367, and upon the pendent jurisdiction of this Court to entertain claims arising under state law.

## PARTIES

**13.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Twelve (12), in their entirety, as if fully copied *in extenso* herein.

**14.** Plaintiff, Jessie Nobles, was at all times relevant to this Complaint a legal citizen of the United States of America and a competent adult of the full age of majority and consent, domiciled, living, and residing in the Parish of Livingston, State of Louisiana.

**15.** Defendant, Town of Killian, was and is at all times relevant to this Complaint a political subdivision of the State of Louisiana, which may receive lawful service of process by serving a copy of the Complaint and Summons upon its Mayor, Gillis R. Windham, at 32819 Cypress Drive, Killian, Louisiana 70462. See, *e.g.*, Lind v. Village of Killian, 2000-0376 (La.App. 1 Cir. 5/11/01), 808 So.2d 590.

**16.** Defendant, Town of Killian Police Department, was and is at all times relevant to this Complaint a political subdivision of the State of Louisiana, which may receive lawful service of process by serving a copy of the Complaint and Summons upon its Chief of Police Dennis Hill, at 28284 Louisiana Highway 22, Springfield, Louisiana 70462.

**17.** Defendant, Chief Dennis Hill, was at all times relevant to this Complaint the duly appointed and acting Chief of the police department of the Town of Killian, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Louisiana and/or the Town of Killian.

**18.** Defendant, Officer Shannon Wright Mack, was at all times relevant to this Complaint a duly appointed and acting officer of the police department of the Town of Killian,

- 3 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 3 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 3 of 68

acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Louisiana and/or the Town of Killian.

**19.**     The actions of Defendant Officer Shannon Wright Mack were supported, authorized, approved, and/or otherwise generally ratified (or wholly unchecked) by his superior officer, Killian Chief of Police Dennis Hill.

**20.**     The Town of Killian, Louisiana, is a municipal corporation and the public employer of the said defendant officers.

**21.**     The Town of Killian Police Department is an entity within the Town of Killian, Louisiana, and it does employ, hire, and retain the services of the said defendant officers.

**22.**     Killian Chief of Police Dennis Hill in his official capacity is deemed the "employer" of members of the Killian Police Department, and, as such, the Chief of Police should be the party held vicariously liable for torts committed by the town's police officers, including Defendant Mack. See Nall v. Parish of Iberville, 542 So.2d 145, 149 (La.App. 1 Cir. 1989), citing La. R.S. 42:1441.3, *et seq.*

**23.**     At all times herein relevant, the said defendant officers were acting within the course and scope of their employment with the Town of Killian.

## FACTS

**24.**     The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Twenty-Three (23), in their entirety, as if fully copied *in extenso* herein.

**25.**     The following statement of facts is made upon the Plaintiff's own knowledge, information, and belief.

**26.**     Plaintiff Jessie Nobles worked for Defendant Mack and White Horse Maintenance, Inc. both before and after Hurricanes Katrina and Rita.

- 4 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 4 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 4 of 68

**27.** Following the destruction caused by these storms, Defendant Mack conceived a plan whereby he would use his own political power and position to "steer" the Livingston Parish Council towards hiring Mack's own company, White Horse Maintenance, Inc., to perform the necessary debris cleanup and removal.

**28.** For a variety of reasons—not insignificantly including his own publicized recent arrest for felony theft of two (2) bulldozers valued at more than $250,000.00—Defendant Mack could not push the Council towards hiring a company which he owned.

**29.** Nevertheless, in a very thinly veiled attempt to circumvent the plain intent of the Louisiana Code of Ethics, Defendant Mack devised a plan to "rent" all of his company's equipment to his father and thereafter use his own political influence and office to compel the Livingston Parish Council to hire his "father's" company.

**30.** Ultimately, a sham corporation purported to be owned by Defendant Mack's father received a lucrative contract for debris removal throughout Livingston Parish.

**31.** In truth, substantially all of the contracted cleanup work was performed by employees of White Horse Maintenance, Inc., using trucks and equipment with the White Horse Maintenance, Inc. logo and signage still attached.

**32.** At a certain point the Livingston Parish Council withdrew and withheld funding for its contract with the company purported to be owned by Defendant Mack's father.

**33.** Since the "father's" company was nothing more than a front for Defendant Mack's own company, White Horse Maintenance, Inc., Defendant Mack had no recourse against the "general contractor" which had hired him.

**34.** Thus, when the Livingston Parish Council refused to issue a payment of some $746,000.00 for debris removal, Defendant Mack chose to forego paying his employees,

- 5 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 5 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 5 of 68

including Plaintiff Jessie Nobles, for work they had performed in that endeavor.

**35.**     When Defendant Mack refused to pay Plaintiff Nobles for his debris removal labor, Plaintiff Nobles traveled to Defendant Mack's home and place of business while seeking to be paid.

**36.**     Defendant Mack categorically refused to pay Plaintiff Nobles for his labor and specifically threatened Plaintiff with arrest and prosecution if he persisted in seeking remuneration: "Get the f**k off my property, or I'll have you arrested."

**37.**     In light of Defendant Mack's highly questionable ethical conduct and criminal behavior, it is nothing short of stunning that he would have made such a threat against a young man seeking simply to be paid for work that he had done.

**38.**     In response, Plaintiff Nobles departed Defendant's place of business as commanded; however, Plaintiff described the details of Defendant Mack's ethical violations to a number of prominent citizens in Livingston Parish.

**39.**     As a result of the Plaintiff's factual recitation and a host of other factors, the Livingston Parish Council permanently withdrew funding for Defendant Mack's "sham" cleanup operation, and a large portion of the arrearages remains unpaid at present.

**40.**     Upon information and belief, Defendant Mack blamed Plaintiff Nobles, in part, for his own reversal of fortune.

**41.**     Although Defendant Mack's various business endeavors remain extant (albeit under different names), his own unethical conduct—as accurately reported and detailed by Plaintiff Nobles and others—caused Defendant Mack's loss of a major cleanup contract and hundreds of thousands of dollars in profits.

**42.**     On or about January 29, 2010, Defendant Mack began his employment with the

- 6 -

Case 3:11-cv-00311-JJB -CN   Document 1    05/11/11   Page 6 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18    06/15/12   Page 6 of 68

Killian Police Department.

**43.** Exactly four (4) months later, on May 29, 2010, Defendant Mack undertook a retaliatory arrest against Plaintiff Nobles, his aggrieved former employee who had confronted Mack demanding payment for work performed and who accurately told others of Defendant Mack's unethical conduct.

**44.** In particular, Defendant Mack learned Plaintiff Nobles had several unpaid traffic tickets issued by the Killian Police Department.

**45.** On a Saturday morning, during the 2010 Memorial Day weekend, Defendant Mack traveled to Plaintiff Nobles' home and effected a warrantless arrest.

**46.** Defendant Mack arrived at the Plaintiff's home on a Saturday morning when Plaintiff's guests were arriving for a holiday barbeque.

**47.** Defendant Mack inquired regarding Plaintiff's whereabouts, and the guests responded by summoning Plaintiff from inside his home.

**48.** As Plaintiff approached, Defendant Mack inquired regarding his (Plaintiff's) identity as "Jessie Nobles."

**49.** At the moment Plaintiff confirmed he was, in fact, Jessie Nobles, Defendant Mack grabbed the Plaintiff, twisted his arm behind him, threw him against the side of the patrol car, and handcuffed him.

**50.** Thereafter, Defendant Mack opened the rear door to his patrol car and shoved Plaintiff into the back seat, intentionally slamming Plaintiff's head into the upper portion of the car door opening during the maneuver.

**51.** Defendant Mack did not read any Miranda rights to Plaintiff.

**52.** Defendant Mack did not perform a Terry pat down.

- 7 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 7 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 7 of 68

**53.** Defendant Mack did not perform any search incident to arrest.

**54.** Defendant Mack did not "radio in" his arrest of the Plaintiff.

**55.** Defendant Mack ultimately did not even book the Plaintiff in prison.

**56.** In short, Defendant Mack's weekend arrest of the Plaintiff on several outstanding traffic tickets had every compelling indicia of being a retaliatory act or personal vendetta undertaken by an aggrieved former employer.

**57.** Upon being arrested and injured by Defendant Mack's abusive tactics, Plaintiff was transported to the Killian Police Department where he was interrogated by Defendant Mack alone.

**58.** At no time prior to this interrogation did Defendant Mack advise Plaintiff of his right to remain silent.

**59.** Instead, Defendant Mack used the opportunity of this arrest and his implied power to place Plaintiff in prison as a foray into obtaining a "promise" from the Plaintiff that he would repay some eight hundred dollars ($800.00) in accrued traffic fines and penalties.

**60.** Upon obtaining Plaintiff's verbal agreement to pay two hundred dollars ($200.00) per week until the balance was repaid, Defendant Mack placed Plaintiff Nobles back into his police cruiser, apparently intending to return Plaintiff to his home.

**61.** At a certain point during the return trip, the Plaintiff's parents met them, and Defendant Mack stopped his car and released the Plaintiff to them.

**62.** Following this incident, Plaintiff filed a formal complaint with the Killian Chief of Police Dennis Hill.

**63.** Plaintiff appeared to testify at a subsequent Internal Affairs investigation, at which time Plaintiff was advised by Chief Dennis Hill that all charges against Plaintiff were

- 8 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 8 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 8 of 68

dismissed: "You don't owe us nothing."

**64.** Defendant Chief Dennis Hill advised Plaintiff that Defendant Mack would be immediately placed on leave pending further investigation; however, Defendant Mack was still wearing his badge and driving his police cruiser the following day (*circa* November 2010).

**65.** At no time did Plaintiff physically resist or assault Defendant Mack in any way, and the force used against him was unnecessary, excessive, and reprehensible.

**66.** At no time during the events described above was the Plaintiff intoxicated, incapacitated, a threat to the safety of himself or others, or disorderly.

**67.** Plaintiff committed no criminal offense(s) worthy of arrest and abuse.

**68.** Defendant Mack had no warrant for Plaintiff's arrest, no probable cause for Plaintiff's arrest, and no legal cause or excuse to seize the Plaintiff's person.

### DAMAGES

**69.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Sixty-Eight (68), in their entirety, as if fully copied *in extenso* herein.

**70.** As a direct and proximate result of the said acts of Defendant Mack, the Plaintiff, Jessie Nobles, suffered the following injuries and damages:

a.  Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure;

b.  Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment and excessive force;

c.  Loss of his physical liberty;

d.  Past, present and future medical, hospital, doctor, and related expenses;

e.  Past, present and future physical pain and suffering;

f.  Past, present and future mental anguish and anxiety;

g.  Past, present and future lost wages and diminished earning capacity;

h.  Past, present, and future emotional distress;

i.  Past, present, and future loss of enjoyment of life;

j.  Residual physical disability;

k.  Such other damages which were caused by the aforesaid incident and which were sustained by the plaintiff.

## COUNT I
### (42 U.S.C. § 1983 Against Individual Defendants)

**71.**    The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Seventy (70), in their entirety, as if fully copied *in extenso* herein.

**72.**    Plaintiff Jessie Nobles claims damages for the injuries set forth above under 42 U.S.C. § 1983 against Defendants Chief of Police Dennis Hill and Officer Shannon Wright Mack (hereinafter sometimes "Defendant Officers") for violation of his constitutional rights under color of law, since the conduct and actions of the said Defendant Officers were done under color of state law and in their individual and official capacities and squarely within the scope of their employment.

**73.**    Said acts by said Defendant Officers were beyond the scope of their jurisdiction, without authority of law, and were an abuse of their powers, and said Defendant Officers acted willfully, knowingly, and with the specific intent to deprive the Plaintiff of his constitutional rights secured by 42 U.S.C. Section 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

## COUNT II
### (Assault and Battery Against Individual Defendants)

**74.**    The Plaintiff adopts and restates those allegations contained in Paragraphs One

(1) through Seventy-Three (73), in their entirety, as if fully copied *in extenso* herein.

**75.** Defendant Officer Shannon Wright Mack of the Town of Killian Police Department committed an assault and battery upon Plaintiff Jessie Nobles.

## COUNT III
### (False Arrest and Illegal Imprisonment Against Individual Defendants)

**76.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Seventy-Five (75), in their entirety, as if fully copied *in extenso* herein.

**77.** Defendant Officer Shannon Wright Mack of the Town of Killian Police Department illegally arrested and illegally detained / imprisoned Plaintiff Jessie Nobles.

**78.** As a result of this false arrest and illegal detainment / imprisonment, Plaintiff Jessie Nobles suffered damages as aforesaid.

## COUNT IV
### (42 U.S.C. § 1983 Against Town of Killian / Killian Police Department)

**79.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Seventy-Eight (78), in their entirety, as if fully copied *in extenso* herein.

**80.** Prior to May 29, 2010, the Town of Killian and/or the Killian Police Department developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Killian, which policies or customs caused the violation of the Plaintiff's rights.

**81.** It was the policy and/or custom of the Town of Killian and/or the Killian Police Department to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated by the Town of Killian.

**82.** It was the policy and/or custom of the Town of Killian and/or the Killian Police Department to tolerate known misconduct by Defendant Officer Shannon Wright Mack.

**83.** Both prior and subsequent to May 29, 2010, the Town of Killian and/or the Killian Police Department had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action.

**84.** It was the policy and/or custom of the Town of Killian and/or the Killian Police Department to inadequately supervise and train its police officers, including the Defendant Officer Shannon Wright Mack, thereby failing to adequately discourage further constitutional violations on the part of its police officers.

**85.** It was the policy and/or custom of the Town of Killian and/or the Killian Police Department to not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

**86.** As a result of the above described policies and customs, police officers of the Town of Killian and/or the Killian Police Department, including the Defendant Officer Shannon Wright Mack, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated and acquiesced to.

**87.** The Town of Killian and/or the Killian Police Department, by and through its Chief of Police, instituted and supported unconstitutional acts, customs, and policies whereby Killian Police Officers were permitted and encouraged to engage in the widespread abuse of their status in pursuit of personal vendettas and grievances.

**88.** The acts, customs, and policies of the Town of Killian and/or the Killian Police Department constitute deliberate indifference to the Plaintiff's constitutional rights and proximately caused his injuries as alleged herein.

**89.** Under the doctrine of *respondeat superior*, the defendant Town of Killian and/or

- 12 -

Case 3:11-cv-00311-JJB -CN   Document 1    05/11/11   Page 12 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18    06/15/12   Page 12 of 68

the Killian Police Department is fully responsible for the tortious acts of the individual employees named herein.

**90.** The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the Town of Killian, including Defendant Chief Dennis Hill and/or the Killian Police Department, to the constitutional rights of persons within the Town, and were the cause of the violations of Plaintiff's rights alleged herein.

## COUNT V
### (State Law Action Against Town of Killian / Killian Police Department)

**91.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Ninety (90), in their entirety, as if fully copied *in extenso* herein.

**92.** Defendant Town of Killian, the Killian Police Department, and/or Defendant Officer Shannon Wright Mack failed to exercise due care and failed to properly analyze the facts clearly known to them and, by doing so, they violated Plaintiff's rights under Louisiana law, where Plaintiff was wrongfully detained, arrested, falsely imprisoned, and Defendant Officer Shannon Wright Mack engaged in a shameless conspiratorial abuse of legal process which was made, done, and effected without justification and for no proper purpose.

## COUNT VI
### (Intentional Infliction of Emotional Distress Against All Defendants)

**93.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Ninety-Two (92), in their entirety, as if fully copied *in extenso* herein.

**94.** As a direct and proximate consequence of the outrageous and unconscionable acts and omissions on the part of the Defendants as described above, the Defendant Officers intentionally inflicted emotional distress upon the Plaintiff.

**95.** Thus, the Plaintiff is entitled to a monetary judgment against the Defendants, both

jointly and severally.

## COUNT VII
### (Attorney Fees Against All Defendants)

**96.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through Ninety-Five (95), in their entirety, as if fully copied *in extenso* herein.

**97.** The Plaintiff contends that he is also entitled to the awarding of reasonable attorney fees as a part of the costs of prosecuting the present cause of action pursuant to 42 U.S.C. 1988.

## PARTICULARIZED ALLEGATIONS

**98.** The Plaintiff adopts and restates those allegations contained in Paragraphs One (1) through One Ninety-Seven (97), in their entirety, as if fully copied *in extenso* herein.

**99.** Plaintiff avers and states he was deprived of rights secured by the Constitution or laws of the United States by and through the actions, conduct, policies, and practices of the named defendants, and the said deprivation of rights was committed by Defendants under the color of state law. See, *e.g.*, Lugar v. Edmondson Oil Co., 457 U.S. 922, 931, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

**100.** Plaintiff avers and states the Defendants deprived him of constitutional and/or statutory rights which were clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted. See, *e.g.*, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**101.** Plaintiff avers and states Defendant Shannon Wright Mack violated Plaintiff's right to be free from excessive force during the course of his arrest, where the Defendant's use of force was excessive as measured under the Fourth Amendment's reasonableness standard, and the amount of force used by Defendant Mack was objectively unreasonable under the particular

- 14 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 14 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 14 of 68

circumstances. See, *e.g.*, Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

**102.** Plaintiff avers and states the Defendant Officers are not entitled to qualified immunity where the severity of the atrocities visited upon the Plaintiff were of sufficient magnitude that the Defendants knew or should have known their conduct was patently unconstitutional. Accord, Guite v. Wright, 147 F.3d 747, 750 (8th Cir.1998).

**103.** Plaintiff avers the Town of Killian and/or Killian Police Department had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action, which failure caused or significantly contributed to the violence and abuse visited upon Plaintiff and for which the Defendants are liable in accordance with Harris v. City of Pagedale, 821 F.2d 499, 504 (8th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987).

**104.** Plaintiff finally avers and states, for all of the reasons set forth above, the Defendant Officer's assault, arrest, and detainment of Jessie Nobles was illegal, wrongful and false, where Plaintiff Nobles had committed no crime worthy of arrest and detainment, and there was no need for any amount of force—excessive or otherwise—to be administered against him.

**WHEREFORE**, in consideration of the above and foregoing facts and circumstances as alleged, the Plaintiff now respectfully prays and requests that this Honorable Court:

    a.    Award compensatory damages to the Plaintiff and against the Defendants, jointly and severally;

    b.    Award punitive damages to the Plaintiff and against the Defendant, jointly and severally;

    c.    Issue a court order, pursuant to 42 U.S.C. §1988, that the Plaintiff is entitled to the costs involved in maintaining this action and reasonable attorney's fees;

    f.    Award such other and further relief as this Court may deem appropriate; and,

g.    Issue a court order directing and convening and empanelling a jury to consider the merits of the claims herein.

Dated: May 11, 2011
Baton Rouge, Louisiana

                                        Respectfully Submitted,

                                        **J. Christopher Alexander, Sr., Esq., LLC**
                                        Attorneys and Counselors at Law

                                        ___/s/_____
                                        J. Christopher Alexander, Sr., Esq.
                                        Louisiana Bar Roll No.: 26,591
                                        3751 Government Street, Suite "A"
                                        Baton Rouge, Louisiana 70806
                                        225-761-9456 (telephone)
                                        225-761-7899 (facsimile)
                                        jca@jcalaw.us
                                        Lead Counsel for Plaintiff

                                        **Duncan & Simon, LLC**
                                        Attorneys and Counselors at Law

                                        ___/s/_____
                                        Jay Minos Simon, Esq.
                                        Louisiana Bar Roll No.: 26,515
                                        8480 Bluebonnet Boulevard, Suite "G"
                                        Baton Rouge, Louisiana 70810-2879
                                        225-768-7803 (telephone)
                                        225-768-7804 (facsimile)
                                        jms@duncansimonlaw.com
                                        Co-Counsel for Plaintiff

**WAIVERS / SUMMONS SENT TO:**

**Town of Killian**                          **Killian Police Department**
*Through Its Mayor:*                         *Through Its Chief of Police:*
Gillis R. Windham                            Dennis Hill
32819 Cypress Drive                          28284 Louisiana Highway 22
Killian, Louisiana 70462                     Springfield, Louisiana 70462

**Chief of Police Dennis Hill**              **Officer Shannon Mack**
28284 Louisiana Highway 22                   19675 Perrilloux Road
Springfield, Louisiana 70462                 Livingston, Louisiana 70754

- 16 -

Case 3:11-cv-00311-JJB -CN   Document 1   05/11/11   Page 16 of 16
Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 16 of 68

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JESSIE NOBLES                    DOCKET NO.
                                 3:11-CV-311

VERSUS                           JUDGE JAMES J.
                                 BRADY

TOWN OF KILLIAN, KILLIAN         MAGISTRATE
POLICE DEPARTMENT, CHIEF         JUDGE NOLAND
DENNIS HILL, AND OFFICER
SHANNON WRIGHT MACK

* * * * * * * * * * * * * * * * * * * * * * * * *

    Deposition of OFFICER SHANNON WRIGHT
MACK, 19675 Perrilloux Road, Livingston,
Louisiana 70754., taken in the Law Offices of
KEAN MILLER LLP, II City Plaza, 400
Convention Street, Suite 700, Baton Rouge,
Louisiana, on Tuesday, March 20, 2012, at or
about 4:12 p.m.

REPORTED BY:

    Kathleen A. Wells, RPR
    Certified Court Reporter
    Certificate No. 91023



EXHIBIT

B

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 17 of 68

62

1                    Can we go off the record?

2         BY MR. ALEXANDER:

3                    Sure.

4              (At this time a short break was

5         taken.)

6         EXAMINATION BY MR. ALEXANDER:

7         Q.    Officer Mack, I want to talk to you

8    a little bit about the actual incident that

9    happened on May 29th, 2010.  Why don't you

10   tell me basically what happened.  Obviously,

11   you sworn to the authenticity of your

12   discovery responses.  I want you to tell me in

13   your own words what happened.

14        A.    To best of my knowledge, I was in

15   charge of doing warrants, for the Killian

16   Police Department.  Not that -- I mean, other

17   officers worked them.  But I was working the

18   warrants and had been.  And I had a stack of

19   warrants.  And the warrants that I had, I

20   grouped them.  And the ones that I had that

21   day were two, I think it's Union Landing

22   Road, but it ties in to Boss McNabb.

23   Whatever road that Jessie lives on.  I had

24   three for that area.  So I went to the other

25   residences.  Checked those.  Those folks were

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 18 of 68

1    not home.

2            I went to Mr. Nobles' residence.
3    And knocked on the door.  Let me back up.  I
4    pulled up.   There were some people outside
5    the house.  And there were two homes here.
6    They didn't have the addresses on them.

7            So I asked them.  I don't recall
8    Mr. Nobles' first name.  And Jessie.  And
9    they pointed to the house over there.  So I
10   went and knocked on the door.  Someone come
11   to the door.  And Mr. Nobles come to the
12   door.  And I was explaining to him why he was
13   there.  That they had a warrant.  He had a
14   warrant through -- and I let him know.  I
15   said, I have a warrant for this individual
16   and this individual.  And he told me that's
17   my son.

18           So I was explaining him the
19   warrant.  As I was talking to him about the
20   warrant, Jessie come out the door.  And, you
21   know, as I was explaining to him, Jessie, you
22   could tell he had, you know, kind of an
23   attitude.  He asked.  I still did not recall
24   who he was.

25           Q.   Let me stop you for just a second,

1   if I could, Officer.  When you said you could
2   tell that he had kind of an attitude, what are
3   you talking about?
4       A.   Well, you could tell by his body
5   functions.  And asked what I wanted.  So --
6       Q.   Did you answer him?
7       A.   I said, I'll get with you in just a
8   moment, if you don't mind.  So he kept
9   replying.  And that's when I said, If you
10  don't mind, could you wait out by my car.
11           So I finished with his dad.  Turned
12  and walked to the car.  I asked him again, I
13  said, Just go to the car.  And I finished
14  with his dad.  I walked out there.  As I was
15  holding my papers, explaining to him.  And I
16  asked him, Well, what is the problem here?
17  He told me, that's when he told me.  He says,
18  I just don't f-ing like you.  I said, Okay.
19  For what?  He said, and he started explaining
20  this.  I said no idea.  Okay.
21      Q.   So when you asked him why you
22  don't, why he didn't like you?
23      A.   He brought up the money, that I
24  owed him money.  And I just kind of looked at
25  him blank, like I had no idea.

1      Q.   Did you feel like you owed him
2    money?
3      A.   I did not recall who he was.  Okay?
4    If you need me to explain that, you know.
5    But as I'm saying, I have this warrant right
6    here for you.  And as he lunged, he looked
7    like he lunged at me and hit the paper.
8    Well, he did that, and it was my reaction.
9    You know, as you see somebody come to you as
10   an officer, you have to react.
11     Q.   Okay.
12     A.   And that's what I did.  I reacted.
13   Turned him around.  Put the cuffs on him.
14   Walked him to the back of my unit.  Advised
15   him of his rights.
16     Q.   Let me stop you just a second.
17   Because I want to make sure.  I don't want to
18   go back.  When you say he lunged at you, and
19   then you arrested him.  So were you arresting
20   him because you felt like he was --
21     A.   He was aggressive.
22     Q.   Okay.  So you felt as though at
23   that moment that he was actually may have been
24   assaulting you?
25     A.   Correct.

1       Q.    And you felt like you were
2   justified in arresting him because you felt
3   like he was lunging at you, making like a
4   physically threatening type motion towards
5   you?
6       A.    Correct.
7       Q.    Go ahead.
8       A.    And like I said, I turned him
9   around, cuffed him, and walked him back to
10  the car.  Started searching him.  Advised him
11  of his rights by Miranda card.  That's what
12  we use, a card that we read off.  At that
13  time, I advised -- we have radios with mikes.
14  I advised Livingston, we called 259.  That's
15  KP-22, 259.  Rights advised.  1015.  1015 is,
16  you know, that you are arresting someone.
17      Q.    Fair enough.  When you contacted
18  Livingston over your radio, do you have any
19  idea if there was a recording transmission?
20      A.    To the best of my knowledge, they
21  do.
22      Q.    Okay.  So that should exist
23  somewhere, your actual call that you made on
24  the radio to the Livingston Sheriff's Office?
25      A.    Yes.

1    Q.   And I'm sure the call will reflect
2    that you're testifying to here today, that you
3    arrested Mr. Nobles because he, I guess, for
4    your own personal safety?
5         A.   Yes.
6         Q.   Okay.
7         A.   Again, my intention was just to go
8    there and ask them to take care of -- I
9    explained to his dad, you know, that they had
10   warrants.  And I was doing that.  And, you
11   know, if you can come in and make some
12   arrangements with them to take care of this.
13   I was just basically delivering paperwork
14   that day to ask them come in and take care of
15   these issues.
16        BY MR. ALEXANDER:
17             Okay.  I will follow up with a
18             written discovery request.  But I
19             would like to get, if it exists,
20             the audio transmission of the call
21             that Officer Mack made.
22        BY MS. WHITE:
23             We wouldn't have that.  Rule
24             445 needs to be issued to LPSO.
25        BY MR. ALEXANDER:

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 23 of 68

1           Okay.  We'll take care of it

2           that way.  This is the first I

3           learned that this may exist.  So

4           we'll do that.

5      EXAMINATION BY MR. ALEXANDER:

6      Q.   Could you describe, and I know that

7  the court reporter can't really take down

8  motions.  But I just want you to sort of

9  describe physically the kind of lunging motion

10  that --

11      A.   Well, he just kind of come at me

12  like he was going to grab the paper.  I don't

13  know if he was going to grab the paper.  But

14  when he grabbed, when he come at me, the

15  paper went to the ground.  And I was holding

16  the paper with two hands.  And it went to the

17  ground.

18           You know, so that's when, you know,

19  he took the aggressive mode at me and said he

20  was already aggravated and mad.  And I'm

21  still at, What is going on here?  Why is he

22  so mad?  What is the problem?

23      Q.   Did you feel like Mr. Nobles about

24  to attack you?

25      A.   Well, he was already cursing me

1    verbally.  I mean, he was already mad.  He's
2    to an aggressive to point, before I even got
3    to my unit.  And when I got out there, and
4    started talking with him again, that's when
5    he stated, you know, he was already heated
6    with me, and showed anger.  So, you know,
7    whenever he made that lunge, that's whenever,
8    you know, I took his attempt to assault.  So,
9    as a police officer, you know.
10        Q.    So you arrested Mr. Nobles for
11   assault?
12        A.    Correct.
13        Q.    Where, have you seen a copy of
14   the -- obviously, you did a police report in
15   connection with your arrest of Mr. Nobles,
16   correct?
17        A.    I did a report, yes, sir.
18        Q.    Do you have any idea where that
19   report is?
20        A.    No idea.
21        Q.    Okay.  Have you seen it since this
22   lawsuit has been filed?
23        A.    I have not seen my report, no, sir.
24        Q.    Okay.  But you know you did one?
25        A.    I did do one.

1    Q.    And what did you do with your
2    narrative report related to this incident
3    after you had completed it?
4        A.    It was left where we leave our
5    reports at.  There's a place were you leave
6    your reports.  And that's where it goes.
7        Q.    Okay.  Do you, again, you may not
8    know the answer to this question.  Do you have
9    any idea why that, your police report that you
10   wrote in connection with this incident would
11   not have been produced to me?
12       A.    Have no idea.  No, sir.
13       Q.    You don't know where it is?
14       A.    No.
15       Q.    Do you think it would be helpful to
16   us to have that report?
17       A.    Sure it would be.
18       Q.    All right.  So tell me what
19   happened after you arrested Mr. Nobles?
20       A.    I put Mr. Nobles in the car.  And
21   again, we have to let Livingston know that we
22   are in route.  I let them I was in route to
23   our town hall, to do paperwork.  So that's
24   what you go -- and you do have to do a
25   booking sheet and stuff like that when you

1   arrest someone for LPSO, inventory sheet and
2   stuff like that.
3         Q.   And it's customary that you would
4   be letting Livingston know, okay, basically
5   bringing him in.  I'm bringing someone in?
6         A.   Right.  Well, 1015 is that you have
7   someone arrested.
8         Q.   Fair enough.  And that was also,
9   you also, on your radio log, you are basically
10  on your radio telling that to Livingston, as
11  you are bringing Mr. Nobles in?
12        A.   Correct.
13        Q.   Okay.  So, what was -- let me ask
14  you this.  What was going on in the vehicle as
15  you were transporting Mr. Nobles?
16        A.   Well, as we were going, I was
17  steady explaining to him.  I have no idea why
18  he's mad.  He went to explaining to me again,
19  you know, he was telling me that, that I owed
20  him money.  But then, he said, I worked for
21  your dad.  And I told him, I said, That is
22  issue you need to take up with my dad.  I
23  have nothing to do with that.  You know.  And
24  I told him, again, Jessie, I said, if I owed
25  you something, I apologize.  I don't know

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 27 of 68

1    about it.  And I did.  I said, If I owe you
2    something, I apologize for it.  But I don't
3    know about it.  But, if you say you worked
4    for my dad, that's something you need to take
5    up with him.
6            And made a call to Chief Hill.  And
7    got to PD.  And, you know, done that.  So,
8    that was it.
9        Q.  You just said you made a call to
10   Chief Hill?
11       A.  Correct.
12       Q.  You called Chief Hill as you were
13   transporting Mr. Nobles or before?
14       A.  I don't recall if it was while I
15   was transporting him, or when I got to the
16   PD.
17       Q.  But did Chief Hill, I want to
18   clarify this.  Did he have anything to do with
19   the actual confrontation or arrest that you
20   had of Mr. Nobles?  He wasn't there, was he?
21       A.  No, no, no.
22       Q.  Is it safe to say, and I don't want
23   to put words in your mouth, that Chief Hill
24   learned about this after it happened?
25       A.  About the arrest?

1     Q.    Yes.

2     A.    Yes.

3     Q.    You just can't remember whether you

4  called him after you got to the police

5  department or while you were in route?

6     A.    May have been in route.  Yes.

7     Q.    So what happened after you got to

8  the department?

9     A.    That's when I was talking to

10  Jessie, you know.  And I, I'm thinking I may

11  have talked to Chief Hill.  May have been

12  once or may have been twice.  I don't recall.

13  And talking with him, and speaking with Chief

14  Hill.  And Chief Hill said, Well, why don't

15  you let him come back and take care of his

16  business.  Tell him to take care of his

17  business on these things.

18        And it's kind of left up to you,

19  whether, you know, if I want to pursue the

20  deal.  And I said no.  It was all right with

21  me as far as what had just happened, whether

22  I wanted to pursue the assault or whatever.

23        And that's what I explained to him.

24  I said, Look, Chief Hill, said that you can

25  come take care of your business.  I had the

1   handcuffs off of him.  We talked.  And I told
2   him call his mom and dad, you know.  I could
3   take him back or what have you.
4            And he made a remark that he could
5   walk back.  I said, I'm not going to let you
6   walk back.  I said, I can take you all the
7   way back, or we can meet them, or whatever.
8   And that's when they come back and said they
9   could meet us at Gum Swamp Road.  And I
10  proceeded to Gum Swamp Road on Highway 444.
11           And his mom and dad was sitting
12  there waiting.  I got out the car.  Spoke to
13  his dad.  Got him out of the car.  He did not
14  have no handcuffs on.  Went got in the car
15  with his mom and dad and left.
16       BY MR. JAKUBACK:
17                Is it Gulf Swamp Road?
18       BY THE WITNESS:
19                Gum Swamp.
20       EXAMINATION BY MR. ALEXANDER:
21       Q.   Only in south Louisiana.
22       A.   Only in south Louisiana.
23       Q.   Officer Mack, I want to make sure I
24  understand all this directly.  You're dealing
25  with Mr. Nobles, who you said you had been

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 30 of 68

1      Q.   All right.  Fair enough.  So, you
2  get down to the station.  And if I understand
3  your testimony correct, you have Mr. Nobles
4  there.  Chief Hill is there, too, correct?
5      A.   Chief Hill is on the phone.  Chief
6  Hill is not there.
7      Q.   But you are talking to him on the
8  phone at the station?
9      A.   Correct.
10     Q.   And you are telling Chief Hill
11 what?
12     A.   Just tell him what went on.  What,
13 you know, the present time, you know.  What,
14 how does he want me to handle this?  What
15 exactly, you know, process he wants me to go
16 through, as far as the charges or what went
17 on.
18     Q.   Okay.
19     A.   And he and I discussed it.  He
20 asked me -- I think, best of my knowledge, he
21 asked me how was he acting, stuff like that.
22 And I told him that he calmed down.  We have
23 been talking.
24     Q.   Okay.  And at that point, what
25 happened?

1       **A.**    That's whenever I told him he
2   needed to talk to Chief Hill. And Chief Hill
3   told him that he needed to come and take care
4   of his business. And told him to call his
5   mom and them. And that's, you know.
6       **Q.**    And is that, who called Mr. Nobles'
7   mom at that point?
8       **A.**    Jessie did.
9       **Q.**    Okay. Now, what was the resolution
10  of these outstanding tickets and warrants and
11  so forth when he left the station, his mom and
12  dad came to pick him up? Was that still
13  outstanding, or had that all been taken care
14  of?
15      **A.**    Chief Hill advised me to advise
16  Mr. Nobles to come in and take care of his
17  business. The warrants were still active.
18  Advised him to come take care of his business
19  that week.
20      **Q.**    Okay. And then you, so you relayed
21  that to Mr. Nobles?
22      **A.**    Correct.
23      **Q.**    When you hung up with the chief?
24      **A.**    Correct.
25      **Q.**    Did Chief Hill tell you anything

1    else in the conversation you had with him?

2        A.    As far as?

3        Q.    As far as what to do?

4        A.    No.  He basically told me that, you

5    know, have Mr. Nobles come take care of his

6    business on the warrants.  Spoke with him

7    briefly about the situation with me.  And

8    basically, kind of left it in my hands,

9    whether I pursued it or not.  Asked me if he

10   was calm or not.  I said, Yeah, he is calm.

11   We talked.  So that's why, you know.

12       Q.    Okay.

13       A.    Told him to call his momma.

14       Q.    This conversation that you had with

15   Chief Hill at the station when Mr. Nobles was

16   there, was this before or after you wrote your

17   narrative report?

18       A.    This was before.

19       Q.    Okay.  About how long after you

20   hung up the phone with him did you sit down

21   and write your report?

22       A.    What time did this take place?

23       Q.    I don't have a report.

24       A.    It was that end of the shift.  It

25   could have been couple hours.

96

1  Mr. Nobles before May 29, 2010?

2      A.  No.

3      Q.  Okay.  And it's your position that

4  Mr. Nobles never worked for you, Mr. Jessie

5  Nobles?

6      A.  Best of my knowledge.

7      Q.  It's your position that there were

8  no compensation checks written to Mr. Jessie

9  Nobles by any companies that were owned by

10  you?

11      A.  Best of my knowledge, no.

12      Q.  So Mr. Nobles is simply mistaken

13  when he says that there were checks issued by

14  White Horse Maintenance to him?

15      A.  I do not cut my checks.  Nor do I

16  meet with every one of my employees.  Okay.

17  So to the best of my knowledge, no, he did

18  not.  I do not recall him working for White

19  Horse.

20      Q.  At the time that Mr. Nobles, let's

21  just say in the year 2010, how many employees

22  did you have?

23      BY MR. JAKUBACK:

24          When you say you, did you --

25      BY MR. ALEXANDER:

1    Q.   Yes.

2    A.   It varied from one to four.

3    Q.   Okay.  Was it part of your regular

4  responsibilities to serve arrest warrants for

5  people who had not paid their tickets?

6    A.   Chief Hill put me doing the

7  warrants.  The warrants had stacked up, and

8  you know.

9    Q.   Did he have any other officers who

10 were also doing warrants?

11   A.   The warrants stayed on the side, on

12 the desk, you know.  If an officer was slow,

13 you know, they could go through the warrants

14 and choose to serve some warrants.

15   Q.   How many other officers did you

16 have, were employed by the Killian Police

17 Department, while you were there, other than

18 Chief Hill?

19   A.   Let's see.  One, two -- including

20 myself, I think five, six maybe.

21   Q.   Five or six other officers?

22   A.   Yes.  Shoemaker.  Full-time,

23 full-time.  Myself.  Five or six, pretty

24 sure.  I believe.  Five or six officers.

25   Q.   Okay.  I just have a few more here.

1      Q.   Okay.  And they just didn't have
2    any officers in the Livingston Parish
3    Sheriff's Office -- let me get it out.  There
4    were no officers available in the Livingston
5    Parish Sheriff's Office to accompany you to
6    Mr. Jessie Nobles' house?
7         A.   At that time, no.
8         Q.   And they told you that?
9         A.   Yes.  They were tied up on a call.
10   Yes.  And I explained to her that I was just
11   handing papers.
12        Q.   Says here, "Both officers will
13   proceed to the suspect's location.  And the
14   officer with jurisdiction will arrest the
15   suspect as a fugitive from Killian, transport
16   the suspect to the nearest booking facility
17   where the suspect will be booked."  Obviously
18   in this case the officer with jurisdiction did
19   not make this arrest; you did?
20        A.   Right.  But my intent was not to
21   arrest.  I was just delivering papers.
22        Q.   Okay.  You indicated, it's says
23   here the policy also, "The Killian officer
24   will explain the charges to the suspect,
25   advise the suspect of his or her rights as per

174

1    Chief Hill on February 2nd, 2010, a few days

2    before you were hired.  And it says, "Whenever

3    possible, these arrests will be both video and

4    audio recorded."

5              We talked a little bit earlier

6    about video and audio.  Did you, just to

7    clarify, did you make any effort at the time

8    you that arrested Mr. Jessie Nobles to have

9    either any audio or video of his arrest?

10        A.    Well, it just happened so quickly.

11   My intent was not there to arrest.  I was

12   there to deliver papers.  So, you know.  We

13   have to be talking about, from the time it

14   started, the actual arrest itself, you're

15   talking about a minute.  So, you know.

16        Q.    Okay.  But the policy of General

17   Order 15 doesn't simply involve making an

18   arrest.  It specifically involves serving

19   warrants, correct?  And you can serve a

20   warrant without making an arrest, correct?

21        BY MS. WHITE:

22                  I'm going to object to the form

23                  of the question.  That's not what

24                  the policy says.

25        BY MR. ALEXANDER:

1    discuss the paperwork, the warrant with them

2    to have them make, you know, come to the PD

3    and take care of the paperwork.  Show them

4    the paperwork.  Hey, you need to come in take

5    care of this if you can.

6            That's what I was discussing.  It

7    wasn't going there to pursue an arrest.  I

8    wasn't going there to serve it and say, Hey,

9    I'm going to pick you all up, or anything

10   like that.  I was simply delivering the

11   warrant, and showing them the warrant.  They

12   could have possibly forgot about it.

13       Q.    Fair enough.

14       A.    And say, if you would, come and

15   take care of this.

16       Q.    That's a very, and I appreciate

17   your candor there.  But by going and taking a

18   warrant to Mr. Jessie Nobles at his house, and

19   giving it to him, you are serving a warrant,

20   right?

21       A.    I guess you could say that.

22       Q.    Last sentence, it says, "A copy of

23   the arrest report will be turned in to our

24   office as soon as possible after the arrest."

25   You said you did that, right?

182

1                    REPORTER'S CERTIFICATE

2

3          I, Kathleen A. Wells, RPR, Certified

4     Court Reporter in and for the State of

5     Louisiana, Certificate No. 91023, which is

6     current and in good standing, as the officer

7     before whom this testimony was taken, do

8     hereby certify that OFFICER SHANNON WRIGHT

9     MACK, after having been duly sworn by me upon

10    authority of R. S. 37:2554, did testify as

11    hereinbefore set forth in the foregoing

12    pages; that this testimony was reported by me

13    in the stenotype reporting method, was

14    prepared and transcribed by me or under my

15    personal direction and supervision, and is a

16    true and correct transcript to the best of my

17    ability and understanding; that I am not

18    related to counsel or to the parties herein,

19    nor am I otherwise interested in the outcome

20    of this matter.

21

22                    OFFICIAL SEAL
                      KATHLEEN A. WELLS
                      Certified Court Reporter
23                    in and for the State of Louisiana
                      Certificate Number 91023
                      Certificate expires 12-31-12

24                Kathleen A. Wells, RPR, CCR
                  Certificate No. 91023
25

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JESSIE NOBLES                    DOCKET NO.
                                 3:11-CV-311

VERSUS                           JUDGE JAMES J.
                                 BRADY

TOWN OF KILLIAN, KILLIAN         MAGISTRATE
POLICE DEPARTMENT, CHIEF         JUDGE NOLAND
DENNIS HILL, AND OFFICER
SHANNON WRIGHT MACK

* * * * * * * * * * * * * * * * * * * * * * * *

     Deposition of JESSIE NOBLES, 14552 Hebert
Lambert Road, French Settlement, 70733, taken
in the Law Offices of KEAN MILLER LLP, II
City Plaza, 400 Convention Street, Suite 700,
Baton Rouge, Louisiana, on Tuesday, March 20,
2012, at or about 1:07 p.m.

REPORTED BY:

     Kathleen A. Wells, RPR
     Certified Court Reporter
     Certificate No. 91023



EXHIBIT
C

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 40 of 68

72

1    communications between Officer Mack and your
2    father?
3         A.    No, sir, I wasn't.  They stepped on
4    the porch and shut the door.
5         Q.    And I say Officer Mack.  I assume
6    that's who it was.  Is that a fair statement?
7         A.    Yes, sir.  At that point in time, I
8    didn't know who -- all I knew is there was an
9    officer at the door.
10        Q.    That was my next question.  Did you
11   know it was Officer Mack?
12        A.    No, sir.  I got up and looked out
13   of the blinds and see it was a black Crown
14   Victoria.  As far as I knew, I thought it was
15   a detective.  I sat back down.  Next thing I
16   know, a few minutes later, my dad calls me
17   and said, Hey, he wants to talk to you.
18        Q.    How long, how long was your dad and
19   Officer Mack on the porch?
20        A.    Five to 10 minutes.
21        Q.    And you didn't hear any of that
22   conversation?
23        A.    No, sir, I didn't.
24        Q.    You were watching television?
25        A.    Yes, sir, I was.

1          Q.    What show were you watching?
2          A.    I'm not exactly sure.
3          Q.    At any point, did you hear either
4     your father or the officer raise their voice?
5          A.    Never heard either one of them.
6          Q.    All right.  Do you believe that
7     they were having discussions during that
8     period of time?
9          A.    Yes, sir.
10         Q.    By that, I mean do you think they
11    were together during that period of time?
12         A.    Yeah.  They were talking.  My dad
13    is a very calm talk person.
14         Q.    But you didn't hear any Officer
15    Mack raising his voice at any time, did you?
16         A.    Never heard one -- never heard
17    nothing.
18         Q.    All right.  So when your father
19    says, He wants to talk to you --
20         A.    Yes, sir.  He opened the door.
21    Stuck his head in the door and said, Hey, he
22    wants to talk to you.
23         Q.    All right.  Tell me what happened
24    then?
25         A.    I walked to the door.  Walked to

1    the door.  Opened the door.  That's when I
2    seen his face.  And then I looked down at his
3    name badge.  And that's when I realized who
4    it was.
5         Q.   Would you have known him just by
6    looking at his face?
7         A.   Probably not.
8         Q.   All right.  Go ahead.
9         A.   When I walked on the porch, I asked
10   him what did he want.  He said go out to his
11   car and wait for him.  I walked down the
12   steps, which is about 10 feet from the door.
13   Turned around.  Asked him what he wanted
14   again.  He told me, I said -- he told me, his
15   exact words were, "I said go to my car."
16             Walked about another five foot.
17   That's when my neighbors, Jessie, asked me
18   what is going on.  Which he is my age, one of
19   my good friends.  I said, you know, I don't
20   know.
21             Got to the car.  And I asked him.
22   I said, what is this about?  And he said,
23   "Son, you have an attitude problem."  And my
24   exact words were, "Sam, I just don't fucking
25   like you."  At that time is when he grabbed

76

1   there's a cop outside that wants to talk to

2   me.

3          Q.   So you walked to the door, correct?

4          A.   Yes, sir.

5          Q.   You see this gentleman's face?

6          A.   Yes, sir.

7          Q.   And you don't recognize him by just

8   his face?

9          A.   I realize he is somebody familiar.

10  But as soon as I seen him, I glance down and

11  seen who it was.

12         Q.   All right.  And at that point, the

13  next communication was, Officer Mack saying,

14  "You need to go to my car."  Correct?

15         A.   No.  My first words were, "What do

16  you want?"  At that point in time, I did

17  nothing wrong.  I was at my house, watching

18  TV.

19         Q.   And his response was, "You need to

20  go wait at my car."

21         A.   He told me, "Go out to my car."

22         Q.   All right.

23         A.   And I talked 10 foot, 15 foot.

24  Turned around.  Asked him what it's about.

25         Q.   Let me just stop you.  So Officer

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 44 of 68

77

1    Mack, he's is in uniform, correct?

2         A.    Yes, sir.

3         Q.    And you know he's police officer?

4         A.    Yes, sir.

5         Q.    He instructs you to go to his car,

6    correct?

7         A.    Yes, sir.

8         Q.    Did you comply with that request?

9         A.    I walked 10, 15 feet.  Turned

10   around.  Asked him what this was about.

11        Q.    So the answer is no, you did not

12   comply with his request?

13        A.    No, I didn't.

14        Q.    Okay.  So you walked 10 feet,

15   turned around and said, What is this about?

16        A.    Yes.

17        Q.    What was his response?

18        A.    He told me, "I said go to my car."

19        Q.    All right.  And what did you do?

20        A.    I walked to his car.

21        Q.    All right.  And when you got to the

22   car is when he said what?

23        A.    When I got to the car, he put down

24   his clipboard and said I had an attitude

25   problem.  And that's when I told him I don't

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 45 of 68

1        **A.**    No.   The statement is accurate.
2    The statement doesn't say where I was by the
3    car or what I said, either.   When I got off
4    porch is when I turned around asked him, What
5    is this about.   The whole time I'm asking,
6    What is this about, I'm walking to his car.

7        **Q.**    Okay.   At what point did you
8    realize -- strike that.   You said that as soon
9    as you saw Officer Mack's badge, you made the
10   connection that he was the guy that you had
11   worked for.   Is that a fair statement?

12       **A.**    Yes.   I knew who he was.   When
13   someone opened the door and seen him, my
14   first thought was, I know him.   And then I
15   looked at his badge.   And I'm like, yeah.
16   That's who I thought it was.

17       **Q.**    When do you believe it was that
18   Officer Mack recognized you?

19       **A.**    I don't think he ever did.

20       **Q.**    All right.   At some point, did you
21   have a discussion with him about the fact that
22   he owed you money, and you worked for him?

23       **A.**    Yes, sir, I did.   In the back of
24   the cop car on the way to the town hall.

25       **Q.**    So to best of your knowledge, it

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 46 of 68

1     was in the back of the police car that he

2     realized, or that he was informed that you

3     were who you were?

4          A.    I told him who I was and why I

5     acted the way I did.  And he still didn't

6     remember who I was.

7          Q.    All right.  How long was it from

8     the time that you left the house until you got

9     to the police station?

10         A.    Fifteen minutes.

11         Q.    And then how long were you at the

12    police station?

13         A.    Five to 10 minutes.

14         Q.    All right.  And then, there was of

15    course a transport from the police station to

16    where your parents were, correct?

17         A.    When we left town hall, what he --

18    we when we left town hall, he unhandcuffed

19    me, as far as I remember.  I had my cell

20    phone on me and my keys to my truck.  I

21    called my parents.  He told me, Call your

22    parents.  Tell them to pick you up at Gum

23    Swamp.  And he met my parents at Gum Swamp

24    and left.  My mom and dad brought me home.

25         Q.    Did you suffer any injuries?

1   call and try to file a complaint. And I'm
2   not sure what happened. And that's when I
3   decided to take legal action. I called Perry
4   Rushing. No. I'm trying to think now. I
5   got my time confused.
6           I wanted to file a legal complaint.
7   I wanted to call a complaint. I called Perry
8   Rushing. And that's when I went to talk to
9   Chief Hill. And that's when we wrote up this
10  piece of paper.
11      Q.   All right. Let's talk about your,
12  your damages. Okay?
13      A.   Okay.
14      Q.   You weren't physically injured as a
15  result of this?
16      A.   No, sir. I wasn't physically.
17      Q.   You have gone to see no doctor as a
18  result of this?
19      A.   No, sir, I haven't.
20      Q.   No health care provider, no social
21  worker, therapist, analyst, anything like
22  that?
23      A.   No, sir.
24      Q.   Who is your primer care physician?
25      A.   Whoever is at the doctor's office

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 48 of 68

1  emotional injuries.

2      A.   No, sir.  There was no physical

3  injuries.  I mean, other than a bump on my

4  knee, or a scratch, or something like that.

5  But nothing worth going to the hospital over.

6      Q.   Well, I mean, if you had a bump on

7  the knee, are you going to stand up, when we

8  have a trial in this case and say, Yes, I

9  bumped my knee and I expect to be compensated

10  for that?

11     A.   No.

12     Q.   With regard to criminal lawyer to

13  represent you in this case, where you were

14  arrested, do you have any charged associated

15  with that?

16     A.   No.

17     Q.   And I'm not talking about the

18  lawyers in this particular case.

19     A.   No, sir.

20     Q.   I'm asking you for a criminal

21  lawyer who represented you and charged you in

22  order to get these charges dismissed?

23     A.   No, sir.

24     Q.   All right.  We've already talked

25  about work.  And you didn't miss any work as a

125

1    spoke to an attorney?

2        A.    It was before.  I didn't speak to
3    any attorney or anything until the next day
4    after this happened.

5        Q.    Right.  But you had a conversation
6    with Chief Hill on June 2nd?

7        A.    On Monday.  I spoke to an attorney
8    Tuesday or Wednesday.

9        Q.    Okay.  Tell me what happened, and
10   you can certainly reference that.  I just
11   want, for the purposes of by that, I mean,
12   that exhibit.  I just want to, for the sake of
13   completeness, tell me what happened when you
14   got to the police station?

15       A.    Walked in to the police station.
16   Walked in.  He introduced himself.
17   Introduced the other men there next to hem.
18   I shook both of them hand.

19       Q.    I apologize.  I think you were
20   going to June 2nd.  I'm talking about on the
21   date you were arrested by Officer Mack.

22       A.    Okay.

23       Q.    You drove, he drove you to the
24   police station, correct?

25       A.    Yes, sir.  Got me out of the car.

126

1 Walked me in.  Walked in the front door.
2 Showed me how much my tickets were and all
3 that.  Asked me when could I pay on them.  I
4 told him I just started work.  I could make
5 my first payment in two weeks.  I believe I
6 signed a piece of paper saying that I would
7 make a first payment within so much.
8          I'm not sure if he handcuffed me or
9 not.  But put me in the back of the cop car.
10 Brought me back to Gum Swamp Road.  And told
11 me call my parents.  My parents met me there.
12 I think they were there waiting on us when we
13 got there.  Got out the car.  Got in the car
14 with them and left.  Went on home.
15     Q.    In the meeting with your parents
16 halfway, was that as a convenience for him or
17 for you?
18     A.    I really don't know.
19     Q.    The, you signing that statement
20 saying that you would pay the tickets, that
21 wasn't done under duress, was it?
22     A.    No.
23     Q.    I mean, you owed the tickets; did
24 you not?
25     A.    Yes, sir.

1          Q.    I mean, I'm not trying to be cute
2      here, but you certainly didn't pay your fines,
3      correct?
4          A.    No.  I understand that.
5          Q.    I mean, there certainly was a right
6      to have an arrest warrant executed upon you
7      that day, correct?
8          A.    I understand that, yes, sir.
9          Q.    You don't contest the validity of
10     the arrest warrants?
11         A.    No, sir.  I do not contest any
12     reason on a cop being at my house that day
13     for arresting me or anything else.  If it
14     would have been any other cop, I would have
15     yes, sir, no, sir.  Got in the car.
16     Whatever.
17         Q.    But it wasn't any other cop.  It
18     was Officer Mack, who you did not like?
19         A.    Exactly.
20         Q.    Despite signing this document
21     saying you would make restitution, you then
22     went back to the chief and got the charges, or
23     the financial obligations obliterated, for
24     lack of a better word, or wiped out?
25         A.    Yes, sir.

1    arrested you?

2         A.    I do, yes.

3         Q.    And the fact that it was Officer

4    Mack and not any other officer is what you

5    object to?

6         A.    If it would have been any other

7    officer, I would have been yes, sir, no, sir.

8    Agreed to anything they said.  And I

9    probably, they would have probably told me,

10   All right.  Pay this ticket, here there.  And

11   have a nice day.

12        Q.    But the reason that didn't happen

13   is because you don't like Officer Mack?

14        A.    Yes.  That's right.

15        Q.    All right.  After you were

16   dismissed, or released to your parents, where

17   did you all go?  Home?

18        A.    Went back home.

19        Q.    All right.  Did you do anything

20   that day?

21        A.    Ate barbecue and watched TV.

22        Q.    All right.  How long did you do

23   that?

24        A.    Until 7:30, 8 o'clock.

25        Q.    Were the relatives and neighbors

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 53 of 68

1    have happened.

2         Q.   All right.  So it's not necessarily

3    that the Killian Police Department didn't

4    supervise him.  It's prior employees didn't

5    supervise him?

6         A.   Well, that.  And if Killian were to

7    supervise him, this incident wouldn't have

8    happened.

9         Q.   If I understood your prior

10   testimony, you don't contest that he had the

11   right to be on the property affecting a

12   warrant, correct?

13        A.   No.  He had the right to be

14   property and deliver the warrant.  But how he

15   went about delivering the warrant and how he

16   continued on with it was unprofessional.

17        Q.   Okay.  By unprofessional, you are

18   talking about the fact that you were arrested

19   after you started verbally assaulting him,

20   correct?

21        BY MR. ALEXANDER:

22             I'm going to object to the

23             characterization.  He offended by

24             the right that he didn't read his

25             rights, and whole host of things

Case 3:11-cv-00311-JJB-SCR  Document 18   06/15/12  Page 54 of 68

1    Q.    That's exactly what I wrote down.

2    A.    Yes, sir.

3    Q.    None of this would have happened?

4    A.    No.    If it would have been any
5    other officer, I would have walked outside.
6    They would have told me what they were there
7    for.    I would have obliged them any way I
8    could.    Nine out of 10, they would have told
9    me, All right.    You need to go take care of
10    this as soon as possible.    And have a nice
11    day.    And I would have walked back inside,
12    and they would have continued.    And not
13    thought nothing else of it.

14    Q.    But you didn't do that because it
15    was Officer Mack?

16    A.    Exactly.

17    Q.    Now, backing up, if on November 11,
18    2007, you hadn't been issued a ticket by Kevin
19    Whittington of the Killian Police Department
20    for speeding and expired motor vehicle license
21    and insurance, then none of this would have
22    happened, correct?

23    A.    Exactly.

24    Q.    Further backing up, if you hadn't
25    been speeding, or driving with an expired

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 55 of 68

1    tickets and getting arrested.  I do not have
2    a history of not following the law and not --
3    not necessarily not following the law, but
4    resisting arrest or anything like that.
5         Q.   Well, I'm not saying that you
6    resisted arrest.  You've admitted to me on
7    several occasions that Officer Mack asked you
8    to do something and you didn't comply with it,
9    correct?
10        A.   Correct.
11        Q.   You told me on numerous occasions
12   that you mouthed off to Officer Mack because
13   he was out there, correct?
14        A.   I wasn't mouthing off to him as an
15   officer.  I was mouthing off to him as a
16   person.  There's a difference.
17        Q.   And I understand that.  It's
18   because you have history with Officer Mack?
19        A.   Exactly.  If it had been any other
20   cop, I would have been yes, sir, no, sir.
21   Been 100 percent compliant and done anything
22   they asked.
23        Q.   But it wasn't any other cop; it was
24   Officer Mack?
25        A.   Correct.

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 56 of 68

1       Q.   And he was lawfully there to
2    lawfully serve you with a warrant for these
3    three outstanding arrests; was he not?
4         A.   He was.
5         Q.   You said something about the fact
6    that this was a Sunday and not a Monday.  If
7    this had happened on Monday morning, would we
8    be sitting here today?
9         A.   Probably not.
10        Q.   Okay.  What if it was Officer Mack
11   on the Monday morning?
12        A.   Still probably wouldn't.
13        Q.   Okay.  So the fact -- the crux of
14   the issue, if you will, is the fact that it
15   was during this holiday weekend that it was
16   done?
17        A.   Yeah.  Family and friends, you
18   know, kids running around and all this.
19        Q.   Right.  But you don't know what the
20   policy is of the Town of Killian with regard
21   to the execution of these type warrants,
22   correct?
23        A.   No, I do not.
24        Q.   I mean, it's possible that the Town
25   of Killian has a rotation whereby people

194

## REPORTER'S CERTIFICATE

I, Kathleen A. Wells, RPR, Certified
Court Reporter in and for the State of
Louisiana, Certificate No. 91023, which is
current and in good standing, as the officer
before whom this testimony was taken, do
hereby certify that JESSIE NOBLES, after
having been duly sworn by me upon authority
of R.S. 37:2554, did testify as hereinbefore
set forth in the foregoing pages; that this
testimony was reported by me in the stenotype
reporting method, was prepared and
transcribed by me or under my personal
direction and supervision, and is a true and
correct transcript to the best of my ability
and understanding; that I am not related to
counsel or to the parties herein, nor am I
otherwise interested in the outcome of this
matter.



Kathleen A. Wells, RPR, CCR
Certified Court Reporter
Certificate No. 91023

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION

JESSIE NOBLES            *    NO.:   3:11-cv-311
                            *

VERSUS                *    JUDGE:   JAMES J.
                            *            BRADY

TOWN OF KILLIAN, KILLIAN   *
POLICE DEPARTMENT, CHIEF   *   MAGISTRATE:
DENNIS HILL AND OFFICER    *         NOLAND
SHANNON WRIGHT MACK       *
   *   *   *   *   *   *   *   *   *   *


       Deposition of CHIEF DENNIS HILL, taken at the

offices of Kean Miller, LLP, located at II City

Plaza, 400 Convention Street, Baton Rouge,

Louisiana   70802, on Wednesday, the 21st day of

March, 2012 at 1:20 p.m.


REPORTED BY:

      QUINCEE B. ROCCAFORTE, CCR, RPR
      CERTIFIED COURT REPORTER



EXHIBIT

D

34

1              And, by the way, how many officers did

2    you have?

3         A.    At that time, eight, I think.

4         Q.    What are your own conclusions as you

5    review your policy regarding Officer Mack's

6    adherence to that policy in the way that he handled

7    the Jessie Nobles's arrest?

8         MS. WHITE:

9              Same objection.

10        MR. JAKUBACK:

11             Yeah.  Let me object to the form

12   because I think he has established that he was

13   serving arrest warrants at that time.

14        MR. ALEXANDER, SR.:

15             Okay.  Fair enough.

16   BY MR. ALEXANDER, SR.:

17        Q.    What was your appreciation of what

18   Officer Mack was doing at the Nobles residence on

19   May 29th?  Maybe he wasn't serving arrest warrants.

20   That's all --

21        A.    You're talking about the reason to go

22   out there?

23        Q.    Yes.  Why did he go there?

24        A.    We have -- can I start from the whole

25   --

1        Q.        Absolutely.

2        A.        We have a warrant board that we keep

3    all of our warrants on.  Whether they're traffic,

4    criminal, what it might be, it's all on one board.

5    Each one of them are set -- excuse me.  Each one of

6    them are set to different areas.  We have

7    out-of-parish warrants.  We have in-parish

8    warrants.  And each of the in-parish warrants have

9    different -- what we consider districts inside of

10   our town.  You have a Killian set.  You have a

11   Maurepas set, French Settlement, so on, so on.

12        Any of the officers can come up, if

13   they're going to be working that side of town, they

14   will grab the warrants for the Maurepas area.  If

15   they're down that way at that point, then they

16   serve whatever they might be able to down that way.

17   Officer Mack, if I remember right, was working that

18   end of town, toward the, what we considered the

19   east -- the east end of our town.

20        And any time my guys go out, our

21   initial contact with a suspect on a warrant, we

22   allow them the opportunity to make contact with our

23   office or myself to try to make good on their

24   warrant, whether it be pay the fine or see our

25   judge or whatever they need to do to take care of

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 61 of 68

36

1  their business.  That's on our initial contact.

2      Q.    And, Chief, is that any time you have
3  an officer who's going out to serve warrants?

4      A.    Yes, sir.

5      Q.    Or is it only in a situation where it's
6  relatively minor infractions?

7      A.    Now, that's -- all we deal with is
8  misdemeanor violations.  We don't deal with any
9  felony.  Our felony has to run through Livingston,
10  through the 21st District Court.

11      Q.    Okay.

12      A.    So any felony warrants or major
13  violations would be served by Livingston Parish
14  Sheriff's Office.

15      Q.    Okay.  So is it fair to say, then, that
16  any time one of your officers goes to serve a
17  warrant, it's your policy, the policy of the
18  Killian Police Department that they try to give the
19  suspect or the person who has the outstanding
20  warrant an opportunity to go in and resolve it
21  without being arrested?

22      A.    Correct.  Yes, sir.

23      Q.    Okay.  Is that reflected in the policy
24  that's in front of you, Exhibit E, in General Order
25  15?

N.O.504.522.2101   N.S.985.206.9303   B.R.225.332.3040
Toll Free 800.526.8720    Fax 985.206.9305

Case 3:11-cv-00311-JJB-SCR  Document 18   06/15/12  Page 62 of 68.

1      Q.    And you could hear Jessie in the
2   background?
3      A.    I could hear him talking in the
4   background.  I couldn't hear what he was saying.  I
5   couldn't tell you the first word that he said, but
6   I could tell that neither one of them at that point
7   were bickering at each other.
8              Sam -- what Sam had told me was he went
9   out there to have -- speak with Mr. Carl Nobles.
10  He went out to speak with Mr. Carl.  Everything
11  went fine with him.  He asked to speak with Jessie.
12  Jessie came to the door and immediately asked him
13  what the hell he was doing on his property.  Sam
14  asked him to wait out by the car.  Mr. Jessie
15  continued -- while he was trying to talk to
16  Mr. Carl, Jessie continued to try to get answers
17  out of him, and Sam said he turned around and told
18  him, I have warrants here for you.  I need you to
19  wait by my car and I'll be out to speak with you in
20  a minute.  He finished up with Mr. Jessie -- I
21  mean, Mr. Carl, proceeded out to Mr. Jessie --
22  trying to keep the Nobles straight.
23              Went out to where Jessie was at near
24  the car.  As soon as he walked up, Jessie started
25  on about money that he owed him in the past.  Sam

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 63 of 68

1    said that he did not know who he was.  He was
2    initially trying to talk to him and the louder
3    Jessie got, the louder Sam got.  He said -- at that
4    point, he said that Jessie never struck him; he
5    just made a move toward him and he took it as a --
6    an assault or trying to do an assault on him, and
7    Sam stopped him, told him to turn around, put your
8    hands behind your back.  He told me, he did lay his
9    clipboard down, placed him in handcuffs, placed him
10   in the back of the car.  He never specifically said
11   he arrested him.  He said he did detain him.  Of
12   course, this is talking to me over the telephone.
13   He said that he detained him and finished up with
14   Mr. Carl.  I'm not sure what he finished up, but he
15   said he finished up with him.

16            Got in the car with Mr. Jessie.  He
17   said, by the time they made it back to Highway 444,
18   him and Jessie, both parties had done calmed down
19   and began to talk.  By the time they made it to our
20   Town Hall, both parties again were completely calm.
21   Talked their issue out is what he said.

22            At that point, Sam made a decision to
23   contact me and find out what I wanted to do, and I
24   told him I have nothing to do with the attempted
25   assault.  That's his charge, not mine.

                                                              42

1          Q.     Was it an assault or attempted assault?

2          A.     I don't know.  I wasn't there.

3          Q.     Okay.

4          A.     I'm not sure.

5                 He asked me what I would like to do as

6     far as the current warrants on Mr. Jessie and I

7     told him if Mr. Jessie's demeanor was good and he

8     had no problems with it, just have him come in and

9     talk with us Monday morning.  And Sam said, yeah,

10    he's doing fine; there's no issues between me and

11    him.  We're sitting here chatting and talking.  And

12    I hung up the phone with him.

13                Give me a minute.

14                I did not speak to either -- any of

15    them, my officer, Jessie, Carl or any of the rest

16    of them for the rest of that night.  It was either

17    Monday or Tuesday, one or the other, when Jessie

18    and them came in that it picked back up again.

19          Q.     Okay.  You did -- obviously, you did a

20    couple of investigative reports related to this

21    matter, right?

22          A.     Two, if I recall.

23          Q.     Yes, sir.

24                I didn't see in there -- and this is

25    not a trick question -- I didn't see any mention in

1  Officer Mack arrested him was because he made a

2  forward movement or a gesture that Sam took as an

3  assault or attempted of onto his person.

4          MR. JAKUBACK:

5          Okay.

6  BY MR. JAKUBACK:

7      Q.    Now, the -- what happened in this

8  particular case -- from an investigation standpoint

9  was did Officer Mack -- I'll leave it open-ended.

10 Did Officer Mack call you from the Police

11 Department when he had Mr. Nobles in his custody?

12     A.    I believe it was from the Police

13 Department.  I'm not sure if it was in his car, but

14 I know it was from that area.

15     Q.    All right.  And in that conversation --

16 what was the result of that conversation?

17     A.    He -- he told me that Mr. Nobles -- he

18 and Mr. Nobles had a confrontation at the house and

19 he placed him -- he detained him, brought him back

20 to the police station, and at that time, he felt

21 that Mr. Nobles had calmed down.  He had calmed

22 down and wanted to know what my opinion was that he

23 do with the citations.  And, again, I asked him

24 about why he detained him, and he told me he wasn't

25 too much worried about that.  He didn't feel that

1    was extremely serious. I said, well, on that part,
2    I can't file charges for that. That's on you. As
3    far as the citations, if Sam felt that the guy had
4    calmed down, both of them had talked and everything
5    was going fine, then it was my okay that he go.
6    ahead and make arrangements to come in and follow
7    up to take care of his business just like with
8    anybody else.
9        Q.    Right.
10           But with regard to the initial, first,
11   which is the initial confrontation with him and the
12   aggressiveness that you described, you left it up
13   to Officer Mack to simply let it go since he had
14   calmed down?
15       A.    Yeah. It's up to the police officer.
16   It's up to them whether or not they pursue charges.
17       Q.    Now, two days later, which is the 31st,
18   Mr. Nobles and his father come in to see you,
19   correct?
20       A.    Correct.
21       Q.    Now, do they tell you or do they give
22   you -- they give you information about what they
23   perceived to have happened, correct?
24       A.    Correct.
25       Q.    It is at that point that Mr. Nobles

Case 3:11-cv-00311-JJB-SCR   Document 18   06/15/12   Page 67 of 68

173

REPORTER'S CERTIFICATE


I, QUINCEE B. ROCCAFORTE, Certified Court
Reporter in and for the State of Louisiana, do
hereby certify that the above-mentioned Witness,
after having been first duly sworn to testify to
the truth, did testify as hereinbefore set forth in
the foregoing 171 pages;

That the testimony was reported by me in
stenotype and transcribed under my personal
direction and supervision, and is a true and
correct transcript, to the best of my ability and
understanding;

I further certify that I am not of counsel,
not related to counsel or the parties hereto, and
not in any way interested in the outcome of this
matter.

OFFICIAL SEAL
QUINCEE B. ROCCAFORTE
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 21016
Certificate expires 12-31-12

QUINCEE B. ROCCAFORTE, CCR, RPR

CSR #21016

STATE OF LOUISIANA

Case 3:11-cv-00311-JJB-SCR  Document 18  06/15/12  Page 68 of 68